AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| BRYAN ROGER BYERS | ) | 3:25-mj- 1168-SJH |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____April 2, 2025_____ in the county of _____Duval_____ in the
_____Middle_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(3) | Possession of a firearm by an unlawful user of a controlled substance |

This criminal complaint is based on these facts:

See Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Chad Lifsey, SA, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____4-3-25_____

_____
*Judge's signature*

City and state: _____Jacksonville, Florida_____     Samuel J. Horovitz, United States Magistrate Judge
*Printed name and title*

## CRIMINAL COMPLAINT AFFIDAVIT

I, Chad Lifsey, being duly sworn, and appointed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), hereby make the following statement in support of the attached criminal complaint.

### I.    Introduction and Agent Background

1.    I am a Special Agent for ATF and have been employed with ATF since May 2017. I am a graduate of the Federal Criminal Investigator Training Program and ATF Special Agent Basic Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. I have successfully completed investigative training courses in the field of narcotics investigations/operations and firearms investigations.

2.    I have been assigned to the ATF Jacksonville Field Office since December 2017. As an ATF agent, I am authorized to investigate violations of United States law and to execute warrants issued under the authority of the United States. In this role, I have participated in many firearms-related investigations, many times as the primary investigating case agent, and other times I have assisted and supported other law enforcement officers in their firearm investigations. These investigations include but are not limited to, matters involving domestic and international firearm trafficking, unlicensed firearms dealing, straw purchasing investigations, unlawful possession of firearms and ammunition, firearms being used

in furtherance of drug trafficking crimes, and unlawful possession of firearms not registered in the National Firearms Registration and Transfer Record (NFRTR).[1]

3.      Prior to my employment with ATF, I was employed as a police officer in Columbus, Georgia for over ten years, where I served as a patrol officer, narcotics investigator, and a patrol supervisor. During my time as a narcotics investigator, I received specialized training to include drug enforcement, investigation of drug traffickers, drug recognition and terminology, clandestine labs investigator training, undercover operations, interviewing techniques, financial/money laundering training, and formal and on-the-job training in the area of electronic surveillance. I am familiar with and have used a variety of investigative methods, including management of confidential informants, visual surveillance, electronic surveillance, informant interviews, interrogations, social media investigations, and undercover operations.

4.  The information set forth in this affidavit is based on my personal knowledge, as well as information obtained from other sources, either involved in the investigation or who have personal knowledge of the facts herein.  Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit.

---

[1] The NFRTR is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government. The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered).

Rather, it only includes the information necessary to support a finding of probable cause.

5.     In the course of my duties as a special agent (SA) for ATF, I am investigating the unlawful possession of firearms and ammunition by Bryan Roger BYERS hereinafter "BYERS." This affidavit relates to that investigation.

## II. STATEMENT OF PROBABLE CAUSE

6.     On October 11, 2024, I reviewed a Jacksonville Sheriff's Office (JSO) police report, which documented the JSO firearm arrest of K.C. I also reviewed the body camera footage of all officers involved in the arrest of K.C.

7.     I reviewed the arrest report and found that, in summary, on September 10, 2024, at approximately 11:15 a.m., JSO Narcotics Tact Team 4 was conducting city wide buy bust operations. During that operation, a JSO Officer made contact with a suspect at the Econo Lodge, located at 5624 Cagle Road, Jacksonville, FL 32216. K.C. was also at the Econo Lodge and had been interacting with the suspect that same morning. When the suspect and the undercover JSO officer completed a drug transaction, the arrest signal was given for JSO officers to descend upon the Econo Lodge.

8.     When the arrest signal was given, K.C., who was still on the Econo Lodge property, began running away from officers on foot. As K.C. fled, detectives observed K.C. throw a black bag on the ground. K.C. was apprehended after a foot pursuit and the black bag was recovered.

9.      According to the body camera footage and the police report I reviewed, the bag was searched by a detective and contained a black Taurus G3C pistol with an extended magazine and 20 rounds of ammunition, with one round found chambered. After identifying K.C., officers discovered K.C. was a felon, and he was then placed under arrest on state charges.

10.      On September 11, 2024, JSO officers requested a firearms trace[2] summary from ATF. I have reviewed the firearm trace summary, and it shows the pistol found in K.C.'s possession was purchased by **Bryan Rodger BYERS** on May 22, 2024, in Jacksonville, Florida.

11.      On or about October 31, 2024, I took the pistol, the extended magazine, and the ammunition into ATF custody. That same day, ATF SA Jesse Hooker, who is considered by our agency to be an interstate nexus expert, physically examined the pistol and determined it to be a Taurus, Model: G3C, 9mm pistol, with the serial number: AEH633330. SA Hooker made a report of investigation, which I reviewed that same day, in which he determined that based on his research, knowledge, and experience, his opinion was the pistol was manufactured in Brazil; therefore, the pistol would have traveled in interstate and/or foreign commerce prior to BYERS

---

[2] Tracing is a systematic process of tracking the movement of a firearm from its manufacture or from its introduction into U.S. commerce by the importer through the distribution chain (wholesalers and retailers), to identify an unlicensed purchaser. That information can help to link a suspect to a firearm in a criminal investigation and identify potential traffickers. Firearms tracing can detect in-state, interstate, and international patterns in the sources and types of crime guns.

purchasing it.

12.    On December 12, 2024, ATF SA Dan McKay and I sought to interview BYERS to ask if he had given or sold the pistol to K.C. The time to crime (TTC)[3] was 104 days. Based on my experience, 104-day TTC can be indictive of firearms trafficking, including but not limited to straw purchasing[4] of a firearm.

13.    SA McKay and I attempted to locate BYERS at his residence located at 10550 Baymeadows Road #1007, Jacksonville, Florida, with no success. I then located BYERS's longtime partner, J.M., who worked at a nearby grocery store. I briefly interviewed J.M., and she confirmed BYERS phone number was xxx-xxx-3955. I made several unanswered calls to BYERS and left a voicemail. J.M. reported Byers worked at the U.S. Post Office downtown.

14.    On December 12, 2024, at approximately 2:50 pm, ATF SA Faith Justice and I were able to meet with and interview BYERS after contacting the United States Postal Inspector Service. The interview took place in the lobby of the U.S. Post Office located at 1100 Kings Road, Jacksonville, FL 32203.

15.    During the interview, I showed BYERS a copy of the ATF Firearm Trace Summary from the pistol found on K.C. I asked BYERS if he remembered

---

[3] Time to crime refers to the period of time (measured in days) between the first retail sale of a firearm and law enforcement's recovery of that firearm.

[4] A "straw purchase" is an illegal firearm purchase where the actual buyer of the gun, being unable to pass the required federal background check or desiring to not have his or her name associated with the transaction, uses another person who can pass the required background check to purchase the firearm on his/her behalf.

purchasing the pistol from U.S. Patriot Firearms, LLC (U.S. Patriot). BYERS stated he remembered the purchase and added that U.S. Patriot does inexpensive transfers of firearms.

16.    I explained to BYERS that the pistol had been recovered by law enforcement and that I wanted to know if he had sold or transferred the pistol to anyone. BYERS reported he did not sell or transfer the pistol to anyone. BYERS reported he was involuntarily committed to a mental health facility and that the door to his home was unlocked when he was taken there. BYERS stated someone must have entered his apartment and taken the firearm. BYERS stated that when he was taken away, his girlfriend was not home to lock the door.

17.    I asked BYERS if he surrendered his firearms to JSO during his commitment to which he answered in the affirmative. I asked BYERS if he reacquired his firearms back from JSO and he replied in the affirmative.

18.    I asked BYERS if he made a report with law enforcement as to the burglary or specifically for his Taurus G3C pistol. BYERS said he had not. I asked BYERS if any of his other firearms had been stolen. BYERS stated he would have to do an inventory of his firearms in order to answer that.

19.    Based on the nature of BYERS's answer, I asked BYERS if he had a drug problem. BYERS denied having a drug problem or any past criminal history. BYERS took my telephone number and stated he would call if any other firearms were missing. BYERS asked if he could get his Taurus G3C pistol back. I advised

BYERS he could file a claim for it but needed to report the pistol as stolen, as well as any other stolen firearms. The interview then ended.[5]

20.    On December 13, 2024, I obtained and reviewed a JSO police report outlining BYERS's involuntary commitment to a mental health facility. From the report, I learned that on July 21, 2024, BYERS voluntarily consented to the temporary seizure of his seven firearms and ammunition. Those firearm related items were collected by JSO and entered into JSO property. The Taurus, model G3C, 9mm pistol, bearing serial number: AEH633330, was not among the firearms JSO recovered. I also obtained and reviewed the JSO release reports for when BYERS's items were returned to him. According to the reports, JSO returned BYERS's seven firearms on September 10, 2024, at 10:21 a.m.

21.    On December 16, 2024, I received and reviewed a JSO police report, which documented that J.M. (BYERS's girlfriend/partner) reported a theft of her vehicle. The report stated that on July 22, 2024, at 10:06 p.m., JSO responded to BYERS's and J.M.'s residence at 10550 Baymeadows Road #1007, Jacksonville, Florida, in Jacksonville, Florida. Officers spoke with J.M., who reported she returned from vacation on that date and did not find her vehicle, a 2015 Honda Accord, where she had left it.

22.    J.M. reported she found a piece of paper covering her camera enabled

---

[5] As of March 7, 2025, I performed a law enforcement database check (LINX), a database in which JSO reports into, and found that BYERS has not reported any firearms stolen since 2014 (JSO Report # 2014-156121).

doorbell and upon entering her apartment she encountered M.B. JSO officers discovered from a previously reported incident, which I also reviewed, that on July 21, 2024, at 6:40 a.m. M.B and S.L. were the complainants on a call to JSO for mental health services for BYERS, which led to his involuntary commitment to a mental health facility.

23.    According to the July 22, 2024 JSO report, the investigating JSO officer contacted Riverpoint Behavior Unit, in Jacksonville, Florida and confirmed BYERS was involuntarily committed.

24.    Supplemental JSO reports that I reviewed stated that on July 24, 2024, JSO located J.M.'s 2015 Honda Accord, at Hometown Inn and Suites, located at 4940 Mustang Road, Jacksonville, FL 32216. The vehicle was recovered but JSO was not able to locate and question S.L. or M.B.

25.    I am familiar with the Hometown Inn and Suites mentioned in the JSO supplemental reports and know that location is considered a high crime area by ATF, specifically for arrests related to drug possession and firearm sales. I am aware of several ATF investigations that have involved this hotel and that K.C.'s arrest location, the Econo Lodge on Cagle Road, is only two miles away from this Hometown Inn and Suites.

26.    On or about December 17, 2024, I conducted a query of the national criminal information center for S.L and M.B. I learned that both individuals are convicted felons.

27.    On or about December 18, 2024, K.C. was indicted by a federal grand jury in the Middle District of Florida, which charged him with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). An arrest warrant was issued and on January 9, 2025, K.C. was arrested by bailiffs at the Duval County Courthouse during a state court hearing. I responded to the Duval County Courthouse to take custody of K.C. and to transport him to federal court for his initial appearance. ATF Task Force Officer (TFO) Derek Pratico assisted me in the arrest and transport.

28.    I also interviewed K.C. at that time. After advising him of his constitutional rights, I asked K.C. where he got the Taurus pistol. K.C. replied, "Bryan BYERS." K.C. explained that BYERS was a "druggy." K.C. reported that BYERS sold the gun to him for "like $100.00." K.C. reported he paid for the firearm in cash and drugs. When asked what type of drugs, K.C. stated "he do crack." K.C. reported he has known BYERS for a while and BYERS had been smoking crack during that time.

29.    K.C. reported this firearm transaction occurred at BYERS's apartment in Baymeadows. K.C. could not remember the name of the apartment. K.C. also reported that BYERS regularly "deals" with sex workers and that K.C. sells his firearms to anybody.

30.    I asked TFO Pratico, who had no knowledge of any potential suspects in two photographic lineups, to present them to K.C. They reviewed the first lineup,

containing a photograph of M.B., but K.C. reported no one was familiar to him. K.C. reviewed the second lineup and identified S.L.

31.    K.C. stated he knew S.L. from around the Baymeadows area. I asked K.C. if S.L. was a party to the firearm transfer between BYERS and K.C.. He replied, "yeah." K.C. explained S.L. was with BYERS when he went to the apartment. K.C. explained that he would go over to BYERS to "chill" and BYERS would "smoke." Based on my training and experience and the context of the conversation, I understood him to mean BYERS would smoke crack cocaine. K.C. stated BYERS asked him if he wanted any of his merchandise and K.C. told him yes. K.C. said he gave BYERS cash, but that BYERS would take anything that would "make the girls trick."

32.    K.C. stated he thinks BYERS handed him the firearm directly during the exchange.

33.    I explained to K.C. that BYERS had an incident where he was committed to a mental health facility. K.C. stated he had heard about it and was told BYERS had tried to kill himself. K.C. explained the firearm transfer occurred before BYERS's commitment. K.C. stated BYERS already had the firearm, in that BYERS did not buy it specifically for K.C. (i.e. BYERS did not straw purchase the firearm specifically for him).

34.    I reviewed BYERS's ATF Form 4473 that he signed in connection with his receipt of the Taurus pistol and advised K.C. that the firearm was purchased on

May 29, 2024. BYERS was committed on or about July 21, 2024. K.C. stated he had the firearm for about a month or two prior to his arrest on the state charges. Again, that arrest occurred on September 10, 2024. K.C. also confirmed that S.L. is a sex worker.

35.     K.C. denied knowing BYERS's longtime girlfriend, J.M. When asked where S.L. could be located, K.C. advised that he did not want to get her into trouble. K.C. stated BYERS was aware of him being in custody.

36.     K.C. stated he did not know if BYERS knew the extent of his criminal history. K.C. stated he and BYERS met through a sex worker. K.C. explained sex workers would often be present when he interacted with BYERS.

37.     K.C. reiterated that S.L. was present when he bought the gun from BYERS, specifically that she was in the room when it occurred. K.C. then tried to recall if the gun deal occurred at BYERS's apartment or if it was at a hotel on Butler Boulevard. He thought it may have been at a Southpoint Suites hotel in that area.

38.     Once inside the United States Marshal Services' cellblock, I obtained an unlabeled digital photograph of BYERS from BYERS's Florida driver's license. I allowed K.C. to view the photograph and asked if he recognized the person in the photograph. K.C. identified the photograph as Bryan BYERS. This was witnessed by TFO Pratico. K.C. was later remanded to the custody of the United States Marshal Service pending trial.

39.     On February 24, 2025, ATF SA Jason Slosson and I attended a proffer

interview with K.C., who was represented by his defense counsel. During the proffer, K.C. reiterated much of what he said during the previous interview clarifying and expounding upon a few points.

40.    K.C. stated that he believed the gun transaction did occur at a Southpoint Suites Hotel located at 4699 S Lenoir Ave, Jacksonville, FL 32216. K.C. reported BYERS was there for S.L.'s services when he ran out of money. BYERS approached K.C. about selling the firearm because he needed cash. K.C. stated he has known BYERS for approximately three years.

41.    K.C. explained that since he has been arrested, he had heard that BYERS is trying to buy his firearms back from people he has sold them to in the past. K.C. explained that prior to being arrested in the instant case, he directly communicated with BYERS through phone calls and text applications.

42.    K.C. reported that most contact he had with BYERS was through S.L. and he contacted BYERS through her and vice versa. K.C.'s counsel reported she had been in contact with S.L. Counsel stated S.L. told her she still currently has all the communications between herself and BYERS. Defense counsel stated that S.L. told her that she would be willing to speak with ATF agents about the incident.

43.    K.C. stated he was unsure if S.L. was still having "meet ups" with BYERS. K.C. reported that S.L. told him BYERS has changed his phone number since K.C.'s arrest in the instant case.

44.    When asked about BYERS's knowledge of K.C.'s criminal past, K.C.

stated he had previously told BYERS he had been to prison and had been out of prison since 2019.

45.    K.C. stated he had bought a few firearms from BYERS over the years and has heard of other people trading drugs in exchange for BYERS's firearms. K.C. stated in the past he has obtained three to four guns from BYERS, including the Taurus, model G3C, 9mm pistol, bearing serial number: AGG286518.

46.    K.C. described BYERS as a drug addict and K.C. reported he has personally seen BYERS use crack cocaine. K.C. reported BYERS drives a black Chevrolet Camaro, a white Honda sedan, and a black Honda pickup truck.[6]

47.    K.C. reported BYERS usually kept a gun on his person. K.C. described the firearms BYERS is known to carry as a .40 caliber or small handguns. K.C. stated after his JSO arrest,[7] BYERS tried to sell him an AR-15, but K.C. declined it.

48.    K.C. advised there may be a text in S.L.'s phone in which BYERS talked about exchanging firearms for money. K.C. stated he brought BYERS drugs and met him in BYERS's hotel room, and then BYERS sold him the pistol.

49.    On February 25, 2025, SA Justice and I interviewed S.L. at the ATF Jacksonville Office. K.C.'s defense counsel was present during the interview.

---

[6] I searched the Florida Driver and Vehicle Information Database and found that BYERS has registered to him a black, 2013 Chevrolet and a black, 2019 Honda pickup. Open-source query of the VIN numbers confirmed the make/model of a Chevrolet Camaro and a Honda Ridgeline.

[7] During his initial arrest, K.C. was detained on state charges. He was on bond prior to being arrested for the instant case.

50.    S.L. reported she has known BYERS for two years. She reported they met each other through drug use. S.L. admitted to being a drug user. S.L. reported that BYERS uses crack cocaine exclusively. S.L. reported her relationship with BYERS typically consisted of BYERS buying drugs for the both of them and then she would have sex with him.

51.    S.L. stated BYERS told her he works at the post office. S.L. positively identified BYERS from an unlabeled photograph containing BYERS's driver's license picture.

52.    I asked about the night that BYERS was involuntarily committed to a mental health facility. S.L. stated she, BYERS, and M.B. had been up all night getting high. The following day, BYERS told them he was afraid that his girlfriend would find out about her and M.B. He then got a shotgun and told them he was going to kill himself.

53.    S.L. stated she called the police and when they arrived, they took BYERS into custody and the police told them it would take a few hours to get all the guns out of the home. S.L. stated after the police left, she and M.B. stayed in BYERS's home.

54.    I showed S.L. a photo of M.B. and she positively identified M.B.

55.    S.L. reported she has known M.B. for two to three years. S.L. stated she believed this interaction to be the first time M.B. and BYERS had met. S.L. said one day BYERS's girlfriend came to the apartment, but she was not present when this

happened, and M.B. never told her what occurred when BYER's girlfriend came back.

56.    S.L. stated J.M. reported her car stolen. S.L. reported she has text messages from BYERS about the car and of BYERS talking about J.M.

57.    When asked about the firearm transfer that occurred between BYERS and K.C., S.L. said she was not there when BYERS gave K.C. the firearm. S.L. reported she assumed K.C. got the firearm from BYERS because K.C. had bought guns from BYERS in the past. S.L. reported she understood the sale of the gun to be for crack cocaine and not money.

58.    S.L. reported she saw K.C. with the firearm at the Econo Lodge on University Boulevard in Jacksonville, Florida. This was the same location where K.C. was arrested with the firearm.

59.    S.L. clarified that she has been present when BYERS transferred firearms to K.C., but she can't say for certain which specific firearm was sold during the times she was present. S.L. said on three to four occasions she has seen BYERS trade K.C. a firearm for drugs. S.L. also reported seeing BYERS transfer firearms to others.

60.    S.L. reported she once saw BYERS sell an AR[8] to a black male drug dealer she knows as "D" at the Extended Stay hotel on Baymeadows Road in

---

[8] An AR-15 style firearm is a lightweight semi-automatic rifle or pistol based on the COLT AR-15 design.

Jacksonville, Florida. She reported the transfer of the firearm was for crack cocaine. S.L. stated she remembered because "D" did not know what to do with the firearm because there was no gun case.

61.     S.L. reported that another drug dealer she knows as J.[9], who is a white male that lives on the westside of Jacksonville, Florida, also traded drugs to BYERS for a firearm.

62.     S.L. reported BYERS's telephone number in her phone is xxx-xxx-3955.[10] This is the only number she had for him. S.L. said in the past few weeks, BYERS had blocked her from contacting him.

63.     S.L. stated she had deleted her messages between herself and K.C. due to him being arrested but reported she had not deleted messages with BYERS since July 2024.

64.     S.L. reported that in addition to the firearms, BYERS also sold his prescription drugs to people on the street. S.L. reported she last saw BYERS about two months ago, and only once since Christmas 2024. On that occasion, she reported they used drugs together. S.L. said that she was the main person who BYERS would get high with because she knew who to get drugs from.

65.     When asked, S.L. reported BYERS was aware K.C. was a felon because BYERS had asked her how he got bonded out of jail. S.L. stated that

---

[9] Last initial of this individual is unknown.
[10] This is the same phone number J.M. gave us for BYERS.

BYERS did know K.C., personally.

66.  S.L. reported that she has known BYERS since mid-2023, and when they would meet, they would get drugs, get high, and then have sex. S.L. also reported that BYERS knows other women that also get high and have sex with him.

67.  S.L. explained she met BYERS through her roommate at the time, and after they met, BYERS came back to get high with her. S.L. stated they were using drugs together every week to every other week until the last four to five months when it slowed down to once or twice per month in frequency.

68.  S.L. thought BYERS's drug activity probably slowed since he was put in the mental health facility. S.L. said that BYERS talked to her about him getting clean, but within a few hours wanted to get high again.

69.  S.L. stated that when K.C. got arrested at the hotel, she knew it was BYERS's gun that had been found on K.C. S.L. reported that on several occasions, BYERS would transfer a firearm to someone, then comment about buying the gun back the next day for twice the price. S.L. said she never heard of the buyback actually occurring.

70.  S.L. stated that BYERS asked her to get into contact with "D's" girlfriend, to initiate getting the AR back but that BYERS never got it back.

71.  S.L. was asked why BYERS would trade firearms for drugs when he had a job and money. S.L. explained that BYERS said his bank was weird about him pulling out money at night, so they would stop him from doing so and that is why he

would transfer his guns.

72.     S.L. denied ever going to the gun store with BYERS but said he told her that he purchases firearms online. S.L. also consented to ATF photographing her text conversation thread with BYERS.

73.     On or about March 4, 2025, I began reading through the S.L.'s text messages with BYERS. The following is a summary of their communications outlining BYERS ongoing drug use/addiction.

74.     The messages began on July 15, 2024, beginning at 1:35 a.m.:

    a. BYERS told S.L. that they should get a tranny, which I understand to be a reference to a transgender sex worker.

    b. S.L. asked to be picked up and said she has "2g of hard." Based on my training and experience, I know "hard" refers to crack cocaine and "2g" refers to two grams of a particular substance.

    c. S.L. stated she needed gas money and requested cash app for $20.00.

    d. BYERS responded, "Do it in the car?" S.L. replied, "Ya."

    e. BYERS and S.L. then discussed her ride leaving her after she got gas. BYERS stated, "I got Zans," possibly referring to Xanax.

75.     The messages continued on July 15, 2024, at 4:37 a.m.:

    a. BYERS and S.L. discuss her wanting to leave her hotel room and situation.

b.  BYERS asked, "Can you drop me off some stuff?" S.L. replied
that she could. S.L. told BYERS he should Uber her to him and
they can get a room and get a tranny over. BYERS asked S.L. if
she knew a tranny and she replied, two. BYERS asked, "white?"
S.L. then sent a photograph of a person.

c.  BYERS and S.L. then discuss a hotel. S.L. declined the
"woodsprings" because she is not allowed there because she sells
sex.

d.  BYERS asked S.L. if the tranny smokes. S.L. said mostly "ice,"
but she does "hard" too. Based on my training and experience, I
know "ice" refers to methamphetamine and "hard" refers to
crack cocaine.

e.  BYERS asked S.L. if she can get anyone to bring him a few
pieces. Based on the context of this conversation, I believe
BYERS was referring to crack cocaine.

76.    The messages on July 19, 2024, beginning at 3:57 p.m.:

a.  S.L. texted BYERS an address and told him to "come now"
because she is alone and has dope. BYERS replied, "I got Zans"
and S.L. offered a trade.

b.  S.L. texted that she was supposed to get endless dope for three
days from one of her sources. S.L. told BYERS to get a pipe and

brillo. Based on my training and experience, I know a pipe and

brillo are commonly used to smoke crack cocaine.

c. S.L. asked BYERS if he needed "boner pills?" BYERS replied he

has Viagra.

d. S.L. texted BYERS a photograph of what looked to be crack

cocaine pieces inside of a heart shaped container.

77.    The messages on July 21, 2024,[11] beginning at 3:30 a.m.:

a. S.L. messaged BYERS about wanting to party. BYERS asked

how much money. S.L. replied, "its mostly money and some

coke." S.L. said she would throw BYERS some "hard."

b. S.L. and BYERS argued about strangers coming into his house.

78.    The messages on July 22, 2024, and July 23, 2024, consist of S.L.

messaging BYERS that she was cleaning his place and hoped he gets help. BYERS

did not respond.

79.    The messages on August 8, 2024, beginning at 3:59 p.m.:

a. BYERS told S.L. that he needed his stuff back. S.L. didn't know

what he meant. BYERS then talked about J.M.'s car being

found.

80.    The messages on August 9, 2024, beginning at 10:42 a.m.:

---

[11] This is the day BYERS was involuntarily put into a mental health facility.

    a. S.L. talked about going to rehab and asked BYERS if he was done partying. BYERS replied, "Yeah I think im too old."

    b. S.L. asked BYERS to party with her. BYERS reported he had Viagra. S.L. replied, "Get boner oils" "Bryan." BYERS replied, "Let's party."

    c. BYERS stated he might be able to take off at 1:00 p.m. and asked S.L. if she had anything good to smoke. S.L. replied, "of course." S.L. then sent BYERS a nude photo. S.L. asked if BYERS wanted to have sex before he got high.

81.    The messages on August 11, 2024, beginning at 10:38 a.m.:

    a. S.L. asked BYERS where he was, and stated that K.C. needs to go to the hospital. BYERS did not answer her.

    b. BYERS later replied, "I have you stuff." S.L. asked what stuff and BYERS replied, Zans.

    c. S.L. reported that K.C. was the only one who would pick her up when the hotel wouldn't wait for payment.

    d. BYERS advised S.L. that he had pain pills too. S.L. told BYERS that she was at the Econo hotel.

    e. S.L. told BYERS that K.C. "ain't even gonna talk to u." BYERS replied, "Why?" S.L. stated she told him not to ask for money or anything.

       f.  BYERS and S.L. discussed the cops being at his door and him not speaking to them.

       g.  BYERS told S.L. that he was going to check himself into River Point Behavioral Mental Hospital.

       h.  S.L. asked BYERS for the pain pills that she could sell. BYERS told her he would help.

82.    The messages on August 12, 2024, beginning at 7:29 a.m.:

       a.  BYERS and S.L. talked about rehab and her saying goodbye.

       b.  BYERS told S.L. all he had was "zans" and "vics." Based on my training and experience, I believe vics are referring to Vicodin.

       c.  S.L. asked for a ride to an outcall. Based on my training and experience, I believe an outcall referred to S.L. answering a sex work request.

       d.  BYERS asked S.L. if she had a hit for him. She confirmed she did, and he responded, "Thanks rough day."

83.    The messages on August 30, 2024, beginning at 10:19 a.m.:

       a.  BYERS and S.L. talked about drugs and sex and their scheduling issues.

       b.  BYERS said he had pain pills at home and S.L. could have three Zans because the rest were locked up at home in his new safe.

       c.  They discussed male sex medication and BYERS asked S.L. to

get him a "new hitter and brillo and lighter" and he would give her zans and a Vicodin when they meet.

d. S.L. questioned if she was talking to BYERS after he said, "Love you." BYERS explained it is him and added "Overlook condominiums" "Crazy Bryan." Based on the context, I believe this response was to reassure S.L. she was talking to BYERS.

84. The messages on August 31, 2024, beginning at 4:00 p.m.:

a. S.L. asked BYERS if he wanted to use a sex toy. Byers said okay and "U got candy?" S.L. replied, yes. Based on the context of the conversation, I believe candy is coded language for narcotics. That term is used many times throughout the thread.

b. BYERS told S.L. to just get him high. S.L. told him to not bring the Camaro because she hated that car. BYERS said that is the only car not in the shop.

85. The messages on September 2,2024, beginning at 4:32 p.m.:

a. S.L. sent photos of suspected crack cocaine captioned "Big ass pieces."

86. The messages on September 3, 2024, beginning at 1:32 a.m.:

a. BYERS told S.L. that he wants to live with her but if he did, he would "never get off the hard." "It's my weakness."

87. The messages on September 5, 2024, beginning at 5:01p.m.:

    a. BYERS stated the police called him and he is getting his guns and ammo back.

    b. BYERS stated he was happy "i get my arsenal of assault rifles back."

    c. BYERS and S.L. discussed J.M.'s car being stolen and Amber's fingerprints.

    d. BYERS told S.L. he came close to cracking her head with a baseball bat because she was yelling at him so much.

    e. BYERS told S.L. that he's off on Tuesdays.

88. The messages on September 9, 2024, beginning at 12:38 p.m.:

    a. BYERS told S.L. that he was at the police station getting his guns.

    b. They talked about money for sex and party favors. BYERS reported he was having trouble at the bank. He was waiting for the bank to release his money. S.L. reported she needed BYERS to cash app $175.00 because that was the cost of the "cookie." Based on my training and experience, I know that cookie in this context refers to crack cocaine.

    c. S.L. offered to sell BYERS's pills for him and that Jeremy wanted to buy a gun.

89.   The messages on September 10, 2024, beginning at 1:13 p.m.:[12]

    a.  S.L. texted BYERS that K.C. got arrested. BYERS replied, he was sorry to hear that. S.L. stated he [K.C.] is a felon, and it had an extended clip. BYERS replied, that's not good.

    b.  BYERS reported he still could not get money. S.L. stated that Jeremy still wanted to buy a gun. BYERS replied, "Can't do it now."

    c.  They discussed BYERS selling pills, S.L. asked for 8, and BYERS agreed.

    d.  S.L. asked BYERS again if he could sell a gun to Jeremy. BYERS asked, rifle or pistol. S.L. replied, pistol. BYERS replied that it could be pricey.

90.   The messages on September 12, 2024, beginning at 8:56 a.m.:

    a.  BYERS told S.L. that if she wanted pills, she would have to come to him after work and bring cash or he would sell them to someone else. BYERS stated he needed cash.

91.   The messages on October 17, 2024, beginning at 7:08 a.m.:

    a.  S.L. told BYERS she was locked up for three weeks. BYERS asked how K.C. was. S.L. stated she did not know.

---

[12]  BYERS received his firearms and ammunition back from JSO on this day at 10:21a.m.

92.    The messages on October 20, 2024, beginning at 9:07 a.m.:

    a.  S.L. asked if investigators came to talk to BYERS today. BYERS did not reply.

93.    The messages on November 1, 2024, beginning at 1:54 p.m.:

    a.  BYERS asked S.L. if she had anything good. S.L. stated she had a xan and pain pill. S.L. sent photos of a naked woman and BYERS stated he had 10 hydros and 20 xans, but he needed a "hitter and brillo, and lighter." Based on my training and experience, I believe BYERS referred to Hydrocodone as hydros.

    b.  S.L. told BYERS she's thinking crazy because of K.C. and the gun and BYERS asking about him getting out.

    c.  BYERS said he was good with everyone, that it was just a bump in the road.

94.    The messages on November 3, 2024, beginning at 2:56 a.m.:

    a.  S.L. and BYERS talked about moving in together.

    b.  S.L. asked BYERS to come over at 5:00 because she'll have money and dope. BYERS stated he will pawn a gun when they open, and take a Viagra.

    c.  S.L. told BYERS to come over because the tranny will be there. BYERS stated he did not have any money. BYERS said he doesn't get paid until Wednesday. S.L. replied, "Gun." BYERS

replied, "Okay." S.L. stated she knows someone will buy one.

   d. S.L. asked BYERS how much for an AR if someone bought one. BYERS replied, "12 gauge" "Pistol grip" "400."

   e. BYERS texted S.L. a weblink for how much a Norinco Mak 90 is worth.

95.   The messages on November 4, 2024, beginning at 6:43 a.m.:

   a. S.L. said that her homegirl will give 3g for that AK and let BYERS do a payment plan to get it back.

96.   The messages on November 7, 2024, beginning at 8:26 p.m.:

   a. BYERS told S.L. to bring him some candy, $50 worth. BYERS sent her his address of 10550 Baymeadows Road. He told her to call him at the box "Bryan byers" and he would buzz her in.

   b. BYERS became inpatient. S.L. said "he" was serving someone else on Baymeadows. Based on my training and experience, I know that serving is a street slang term referring to one selling/delivering drugs.

   c. S.L. replied that the dope was left at the apartment. BYERS said they can do it tomorrow.

   d. S.L. said she had her own stuff and asked where they were going to smoke. BYERS replied in his car.

97.    The messages on December 12, 2024,[13] beginning at 4:15 p.m.:

    a.  BYERS asked S.L. if she had anything good.

    b.  S.L. replied, her trans friend will be around there at 7:00 p.m. BYERS replied he was told to report to work at 5:00 a.m. so they would have to do it another day.

    c.  S.L. offered to drop something off for BYERS, and he said, "Yes."

98.    The messages on December 18, 2024, beginning at 11:11 a.m.:

    a.  S.L. told BYERS that a "Buddy with AR and shotgun said he will take $400 for both together." There was no reply.

99.    The messages on December 27, 2024, beginning at 9:01 a.m.:

    a.  S.L. sent photographs of suspected crack cocaine. There was no reply.

100.   The messages on January 4, 2025, beginning at 3:00 a.m.:

    a.  BYERS messaged, "Deliver?" S.L. asked how much, and BYERS replied, "80" "plus 20 for gas." Based on my training and experience, I know that in this context, "80" referred to the amount of currency for a quantity of $80.00 worth of narcotics.

    b.  BYERS told S.L. he had some of her "favorites." Based on the

---

[13] I interviewed BYERS on this date at 2:50 p.m.

context of the conversation and my training and experience, I

believe BYERS was referring to S.L.'s favorite narcotics.

   c. S.L. stated her "dopeman" may want to buy some of the other

   narcotics BYERS had.

101.   The messages on January 20, 2025, beginning at 7:16 p.m., the last day

BYERS responded to S.L.:

   a. BYERS told S.L., "I got some of those z u like."

   b. S.L. invited BYERS to her rented residence. BYERS declined, so

   she offered to come to him.

   c. BYERS stated he would have to do cash app and stated, "I need

   all the hardware." S.L. asked how much BYERS wanted.

   BYERS replied "80" and advised "I have no hardware if u know

   what I mean." Based on my training and experience, I suspect

   that BYERS asked for the required equipment (i.e. pipe and

   brillo) commonly used to smoke crack cocaine and that he

   ordered $80 worth of crack cocaine.

   d. S.L. asked BYERS how many "zans" he had and if he had any

   "vics." BYERS replied, "6" and again stated, "I need all the

   hardware," "I got nothing."

   e. S.L. confirmed that she had it all.

102.   In the communications I read, there are a few communications in

which BYERS asked for a "Miami Blast." I have come to learn that this is a slang term that refers to a sex worker delivering crack cocaine to a man and then the man using crack cocaine while a sex act is performed by the sex worker.

103.   It should be noted, as referenced in S.L.'s text messages, when BYERS was institutionalized, JSO had seized and later released to BYERS a Norinco/Compasseco, MAK90 Sporter. It was returned to BYERS on or about September 10, 2024.

104.   On March 6, 2025, ATF Industry Operations Investigator (IOI) Christian Blount was conducting an unrelated federal firearm licensee inspection of U.S. Patriot, a federally licensed firearms dealer in Jacksonville. I asked IOI Blount to look for firearm purchases/transfers completed by BYERS. IOI Blount reported to me that BYERS had ordered a firearm on February 22, 2025, and it was awaiting pickup.[14] IOI Blount told me that the firearm was a GForce Arms, model: GFP3GG, 12-gauge shotgun, bearing serial number: 24ERM-1352.

105.   IOI Blount also obtained past completed Firearm Transfer Records (ATF Form 4473s) completed by BYERS and U.S. Patriot's transfer records[15] for BYERS, which he provided to me, and that I reviewed. Of note, U.S. Patriot

---

[14] As of March 26, 2025, BYRS has not picked up the shotgun from U.S. Patriot.

[15] When firearms are bought online, the firearms must be sent to a federal firearms license dealer (FFL). The FFL then has the purchaser fill out the ATF Form 4473 in person and does the background check on the purchaser. If the purchaser passes the background check, the FFL transfers (gives) the firearm to the purchaser. The FFL transfer records for an FFL shows which online store a firearm was bought from, the type of firearm purchased, when the FFL received the firearm from the online store, and when the firearm was transferred to the purchaser.

transferred to BYERS a Palmetto, model: PSA Daggar, 9mm pistol, bearing serial number: FG206266 on or about February 24, 2025; an American Tactical Imports (ATI), model Hybrid HGA, 5.56 mm pistol, serial number: NX024354 on or about January 27, 2025; and a Taurus, model G3C, 9mm pistol, bearing serial number: AGG286518 on December 16, 2024.

106.    On each ATF Form 4473 (revised August 2023), question 21.c asked, "Do you intend to sell or otherwise dispose of any firearm listed on this form and any continuation sheet(s) or ammunition in furtherance of any felony or other offense punishable by imprisonment for a term of more than one year, a federal crime of terrorism, or a drug trafficking offense?" BYERS checked "no" to this question. BYERS signed in block 22 and dated in block 23 certifying his answers were true, correct, and complete.

107.    On each ATF Form 4473, question 21.f asked, "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside. BYERS checked "no" to this question. BYERS signed in block 22 and dated in block 23 certifying his answers were true, correct, and complete.

108.    Based on BYERS's known firearms transfers from U.S. Patriot, the firearms and ammunition seized and released by JSO (including frames/receivers),

and excluding firearms that have previously been recovered by law enforcement, BYERS should be in possession of approximately fifteen firearms, unless he has sold them or traded them for controlled substances.

109.    On March 26, 2025, S.L. spoke to me and K.C.'s defense counsel, over the phone. S.L. told me that on March 13, 2025, BYERS texted her from a new phone number: xxx-xxx-9806. She stated BYERS asked her for some crack cocaine. S.L. stated the amount was larger than he had ever requested previously, so she felt he may be trying to set her up. She stated that later, she went to her drug dealer and saw a sex worker she knew with BYERS meeting with the same drug dealer. S.L. stated that she saw BYERS smoke crack cocaine while they were in each other's company.

110.    On March 31, 2025, I obtained a warrant to search the premises of 10550 Baymeadows Road #1007, Jacksonville, Florida 32256. The search warrant was authorized by United States Magistrate Judge, the Honorable Patricia D. Barksdale in and for the Middle District of Florida.

111.    On April 2, 2025, I conducted pre-search warrant surveillance at 10550 Baymeadows Road #1007, Jacksonville, Florida 32256. I noticed two vehicles registered to BYERS were present at the residence.

112.    At approximately 10:05 a.m., ATF agents and local law enforcement officers executed the federal search warrant at 10550 Baymeadows Road #1007, Jacksonville, Florida. SA McKay knocked and announced police presence with

intent to execute the search warrant. After a short period of time and with no

response, ATF breached the door with manual breaching equipment and

encountered J.M. ATF agents cleared the inside of the primary dwelling and J.M.

was escorted outside. BYERS was not present during the search warrant.

113.    A search of the residence revealed the following items:

    a) A Palmetto State Arms, model: PA10 (frame/receiver), unknown

       caliber (multicaliber), serial number: PF040078,

    b) A Marlin, model:75-20, .22 caliber rifle, serial number: WL003934,

    c) A Palmetto State Arms 16-inch mid length upper receiver with bolt

       carrier group .556 caliber,

    d) A Palmetto State Arms, model: PA15 (frame/receiver), unknown

       caliber (multi-caliber), serial number: LW253791,

    e) A Palmetto State Arms, model: PA10 (frame/receiver), unknown

       caliber (multi-caliber), serial number: SCD922007,

    f) A Norinco (Compasseco, Inc.), model: Mak90 Sporter, 7.62 x 39 mm

       rifle, serial number: 9301347 with magazine, and one chambered

       round,

    g) A Palmetto State Arms, model: Dagger Compact, 9mm semi-automatic

       pistol, serial number: FG206266 with magazine, and one chambered

       round,

    h) Multiple rounds of assorted ammunition, and

i) Two suspected broken crack pipes.

114.   On April 3, 2025, ATF SA Jesse Hooker, who is considered by our agency to be an interstate nexus expert, physically examined the Palmetto State Armory, model: Dagger Compact, 9mm caliber, semi-automatic pistol, serial number: FG206266.  SA Hooker determined that based on his research, knowledge, and experience, his opinion was the pistol was manufactured in Connecticut or South Carolina; therefore, the pistol would have traveled in interstate commerce prior to being found in BYERS's possession.

115.   On April 3, 2025, BYERS went to Wild West Guns and Gold, located at 1233-27 Lane Ave S., Jacksonville, Florida, 32205, and attempted to purchase a firearm. BYERS filled out the ATF Form 4473 and while waiting to take possession of the firearm, I received a notification of BYERS's attempt.

116.   On April 3, 2025, I called Assistant United States Attorney Brenna Falzetta and advised her of these facts and she authorized BYERS's arrest. ATF agents then arrested BYERS at the store prior to him taking possession of the firearm.

### III.   CONCLUSION

117.   Based on the foregoing facts, your affiant believes there is probable cause to establish that on or about April 2, 2025, Bryan Rodgers BYERS is an unlawful user of controlled substances, and did knowingly possess, in and affecting

interstate commerce, a firearm, that is a Palmetto State Arms 9mm pistol, in violation of Title 18, United States Code, Section 922(g)(3).

Respectfully submitted,

_____

Chad Lifsey, Special Agent
BUREAU OF ALCOHOL,
TOBACCO, FIREARMS &
EXPLOSIVES (ATF)

Subscribed and sworn to before me
on this _3rd_ day of April 2025.

_____
SAMUEL J. HOROVITZ
United States Magistrate Judge
Middle District of Florida